We'll remain off record for just a minute. We can't do anything without our clerk, so, of course. No problem. See how much power you have, we're all waiting. Fine. All good. Your Honors, I believe the time was 20 minutes, not 15 minutes, as originally counted. Okay. Whenever you're ready, we're all set now. Wonderful. Good morning, and may it please the Court. Stephanie Taub on behalf of plaintiffs Marley Brown and Lacey Smith, I'd like to reserve five minutes for rebuttal. Counsel, forgive me, but I, given our atypical start, I haven't announced the case, and that's my fault. The case on argument is Brown v. Association of Flight Attendants, 24-3789. We have one counsel appearing by video. I just need to make sure, as a sound test, that you can see and hear us, sir. I can, Your Honor. Okay, great. Sorry about that bobble. Go right ahead. Of course. Thank you. This Court, in Damiano v. Grant's past school district, held that it was religious discrimination for an employer to fire employees for expressing their biblically-based beliefs about gender and sexuality to their coworkers. And that is precisely what Alaska Airlines did here. Why is that true of Smith? Well, Smith, if you read her notice of discharge, it's very clear that the employer said defining sexual orientation or gender identity as moral issues was a discriminatory statement. So this is clear that the employer is firing her because she held traditional moral beliefs about gender and sexual morality. How do you get from there to a religious belief? Well, the way the EEOC defines religion includes moral beliefs as to what is right and wrong that are held with the strength of religious beliefs. So under that definition, it's clear that the employer is firing her because of her moral beliefs, and those are covered and protected against religious discrimination under that EEOC's definition. And also, under Amber Crombie v. or the EEOC v. Amber Crombie standard, the Court held that it is religious discrimination, that an actual knowledge requirement of a plaintiff's religion is not required. That instead, even an unsubstantiated suspicion that the employee might be religious is enough. And if the employer at least suspects that this is a religious belief, then that is sufficient. And here, Alaska Airlines put out official statements on its, for instance, its social issues engagement platform, that was its official public statements, saying that the airline knew that many people hold religious beliefs related to the Equality Act. And so this, the airline clearly knew that many people hold religious beliefs about gender and sexual morality. It's also common knowledge. This had to be specific as to Smith. And it puts Alaska Airlines, I find this case troubling, vis-a-vis Smith in particular, because they also have an obligation to not allow a hostile work environment to continue. They have 26,000 other employees, right? Oh, sorry. No, no, no, I'm just trying to push back and tease this out a bit. Because the fact that Alaska Airlines was aware, as you say, you know, writ large, that many people have these beliefs, doesn't help me very much in this argument. Well, of course, employers have a right, an obligation, to prevent hostile work environments and to protect all of their employees. The problem comes when they're weaponizing or misusing their policies to target a particular protected class. And that is what's going on here. And a reasonable jury could so find. Her statement is much less troublesome to me. It's not overtly religious, at least, in its one sentence, right? And she was on probation, as you know, because of her prior conduct. And I, this one, this one's harder. What's your strongest argument that, at step one, that this was, that she was terminated because of her religious beliefs? For Smith? Yeah. Well, our strongest argument, well, we have the two main arguments, which is under the EEOC's definition, and then under Amber Crombie. So the airlines put out those social issues engagement platform, acknowledging that it recognized that people hold these religious beliefs. Joseph Sprague, her president of Horizon, interpreted Brown and Smith's comments to be raising religious concerns. The airline knew that they were repeatedly raising religious, that people were repeatedly raising religious concerns about the airline's support of the Equality Act. So under this, it's very similar to the Amber Crombie case, where an employee came in as an applicant that was wearing a head covering. And many people know that many Muslim women wear head coverings for religious reasons. So even though they didn't have actual knowledge that that employee was religious, their suspection, their suspecting that she was, was sufficient. But in this case, if we're just talking about Smith, it's harder than that, right? Because they investigate, she didn't say that this was a religious statement. And quite to the contrary, until it got to grievance time, post-termination, her response was that this, that her single-sentence statement was intended to be a philosophical question. She did say that it was a philosophical question. In Damiano v. Grant's past school district, the court there held that their biblically-based beliefs on gender were also philosophically based, and that didn't preclude bringing a religious claim. And also- Did they claim religion there? I mean, for me, it's quite noticeable that she didn't, in the investigation stage, didn't claim that this was an expression of her religious view. She was, she didn't know that they were going to fire her because of her moral beliefs at that time. So it wasn't until she received her notice of discharge that the, that she realized that they were firing her because of the way that she defined gender identity and sexual orientation. So she read her notice of discharge, she realized that she was being fired because of her moral beliefs, and which she held for religious reasons. And that's when she explained her situation at the next opportunity, which was her grievance hearing. Would there have been any problem if Alaska had just taken the post down? No, we don't believe that would have risen to the level of an adverse action, if they would have just taken the post down, and that would have been an acceptable solution. They had less severe sanctions they could have imposed, for sure. Your strongest argument is that the one they took was impermissible, despite their zero tolerance policy, because no reasonable juror could decide this was anything other than on the basis of her religion? No, that's not exactly the standard. So it's that, well, reasonable jurors could find- Oh, forgive me, that reasonable jurors could find, a reasonable juror could find. I did misspeak. That's your position, though. Yes, at a minimum. We believe that the evidence shows that a reasonable juror could find that they fired them because of their religious beliefs. Does it matter that she made the post sort of in response to Alaska's statement on this sort of company intranet? In other words, if she, for example, had said directly to another coworker who she knew was gay this same comment, would that be a different case? It could possibly. But that would depend upon, of course, the factual circumstances. So if you have a case like Bodette, for instance, where you have a supervisor that is repeatedly coercing her subordinate over a period of months, including during her performance reviews, such that she was afraid for her position, that would, of course, be a very different situation than this one, where the company is opening up this forum. And even a week before, on the Alaska's World website, on the racial equity policy, there was open discussion, which got heated and even led to accusations that the comments were offensive to other people. But they allowed that discussion. And so this was the forum without disciplining or even removing comments. So this was the forum plaintiffs were posting into. But then because of plaintiffs, the airline fired them, of course, and then changed its commenting policy to prohibit religious comments moving forward. And I'm still trying to think of line drawing here, and I think that's a favorable fact for your clients that Alaska had opened this intranet forum. But what if with flight attendants on a flight gets in the PA system and says, you know, put your seats and trace upright, and oh, by the way, the Equality Act can endanger our religious liberties. Would Alaska be able to discipline a flight attendant who does that? Most likely, yes. I don't see why. If that was their neutral policy that was applied in a nondiscriminatory way, that a flight attendant can't go on and post their positions about controversial subjects over their intercom, which probably is their policy, then that would be a very different case here. So the problem is not only did the airline apply it or define its policy to define their religious beliefs as inherently discriminatory, but it applied its harassment policy in a way that discriminates against Christians. So even just looking at that, with the way the airline treated flight attendants who were accused of discriminating and harassing against Christians was very lenient. It let those flight attendants go with just an oral warning or no discipline at all. But when Christians were accused of violating the same policy, Christian flight attendants, they were given lengthy suspensions or terminations. Is there any problem with Alaska going forward prohibiting on Alaska's world the discussion of religious topics? Is that something you think they can do? It's not this case because we're talking about a termination, but is that one way they can address this? Discussion of religious topics going forward, it could potentially be a solution if they want to. I thought you said they now don't allow religious comments at all on Alaska's world. Is that correct? They don't. They changed their commenting policy to not allow religious comments. The reason why that's very important here is because they changed that commenting policy because of plaintiffs. So it shows that what happened to plaintiffs was religious discrimination and that they are targeting them because they found an expression of their religious beliefs to be inappropriate on their comment, to be discriminatory. This court, in fellowship of Christian athletes, held that disparaging traditional Christian beliefs about marriage as discriminatory or hurtful was itself evidence of anti-religious animus. So we'd argue that the same finding could be here, that a reasonable jury, viewing all the facts in the light most favorable to Brown and Smith, could see that the airline disparaging their religious beliefs as discriminatory and offensive and even hateful is evidence of anti-religious animus. There's also a claim against the union, so does the nature of the facts look any different when you're looking at Alaska Airlines as a defendant versus the union? The facts are overlapping, but the facts against the unions are very stark. So we have the most salient fact is the fact that the union president repeatedly contacted the airline to report plaintiffs' comments for discipline, and in one of those comments, when he was reporting Brown and Smith, he complained about their religious faith. He said, check out Marley Brown's post, as if Lacey's wasn't enough. I wish fewer people would struggle so much with unifying their faith with inclusivity. So this is direct evidence that the union president was offended by their religious beliefs and was complaining to the airline and seeking to get them disciplined because of those religious beliefs. There's also this preemption issue with respect to the state law claims. Just before we get into the merits of that, of the preemption issue, does this issue really matter from a liability standpoint? I understand you want to be able to pursue the state law claims on behalf of your clients against the union, but would it change anything in terms of the bottom line? All the parties agree that the analysis here would be the same, but it could affect the  In what way? Well, there are different requirements, or there are different standards under the legal. Do you believe you'd be possibly entitled to greater relief under state law? Yes. Yes, Your Honor. So the reason why the preemption issue should be addressed is there is conflict within this circuit, and we argue that it's, this court should follow the very detailed reasoning of Figueroa v. Ferguson, which found that state law employment discrimination claims are within the intent of Congress and are not preempted. Atkins v. Morales is very, or did not address that issue of whether state employment discrimination claims are preempted. And because those state claims derive from the state statute rather than from the collective bargaining agreement, they are not preempted. Are there further questions at this point? Is that a no? Yes. Okay. I don't think we have any further questions at this point. Would you like to reserve your time? Yes, Your Honor. You bet. Good morning. May it please the Court, Lauren Paris Watts of Syfarth Shaw on behalf of Alaska Airlines. Your Honors, this Court should affirm the district court's grant of summary judgment in Alaska's favor. I want to clarify the reason for Alaska's termination of appellant's employment and then address why the appellant's position is untenable, both practically and legally, and also why Alaska's decision was an exercise of its business judgment. With respect to the basis for termination, appellants terminated the employment not because of the religious beliefs, but because of their discriminatory conduct. And I would ask the Court to look at the evidence, which was just referenced by counsel, which is the notice of discharge. So for Smith, it says that Smith broadcast it — well, the reason she was terminated is because she broadcasted statements that all LGBTQ individuals are immoral. That is what the — how Alaska interpreted her comments, and that is reflected in the notice of discharge. How is that self-evidently a reasonable interpretation? Perhaps that's an interpretation, but all it says is, do you think it's possible to regulate morality? Well, Your Honor, the fact that she put the question mark and used it as a rhetorical device doesn't change it from an expression of her belief that this — that folks who are at issue in this article, which is the LGBTQ community, are immoral. So I agree the question mark doesn't change — I mean, it's a provocative statement. So I think in response to Judge Barresa's question, if you could circle back on it, I think it's an important point. Even if we interpret it, as I think Alaska did, as not a sincere question, I think they interpreted it as a statement. How does that change the equation that you're really asked to respond to here? And the question being, how is it — If it's a primitive statement, then one cannot regulate morality. Let's take it as that, because I think that's how Alaska pretty clearly interpreted it. But you've asked us to look at that one-sentence statement and compare it to the notice of  Right. Which is the notice of discharge meaning how Alaska not only interpreted it — that's the record, the evidence of how Alaska interpreted that statement and what Alaska told Smith as part of her investigatory process and her termination, how they interpreted that statement. Right. And so I guess what Judge Barresa is getting at, I think, and certainly what I would like you to get at is to talk about that gulf and whether that's a reasonable interpretation or what happens if we think it wasn't a reasonable interpretation. Well, Your Honor, I would remind the Court that it's not for the Court to sit as a super personnel department and to second-guess Alaska's decision. The question is, did Alaska enforce neutral policies, anti-discrimination policies, which it did? And we don't just have Alaska's interpretation of this. We also have the response from Alaska's workforce to these statements. Responses like, highly offensive, I feel like I'm in sixth grade again, being abused by other kids, somebody's using their soapbox to further marginalize already marginalized people. Right. So can we just — I think that's right. And this is why I think Alaska was in a really tough spot. They have to make sure — and the record, as far as I can see, is they were very concerned about making sure they didn't have a hostile work environment. Okay. I get that. Judge Barresa is also right. I think, clearly, there are other steps they could have taken, right? And so I'm trying to make sure that we understand clearly what your argument is about the legal ramifications here. Alaska didn't have to interpret this quite as broadly as it did, I don't think. So what do we do if we think that the statement — and I'm willing to go with you that it was an affirmative statement as opposed to a question, right? But what do we do if we think that there was another interpretation Alaska could have given it or that Alaska — more importantly, that Alaska's interpretation as expressed in the notice of discharge was an unreasonable interpretation? Well, Your Honor, I would remind the court as to Smith, and since we're focusing on her statement — We're focusing on Smith, right. — was in progressive discipline. And the record is very clear that she was told in no uncertain terms anything else, an attendance issue, will result in termination. She was within six months of the most egregious discipline that Alaska had ever given a flight attendant, which was a 30-day unpaid suspension. So her making a statement that could have resulted in something less, you know, maybe a — I don't really see how that changes the quality of the statement. I mean, I think she was on thin ice, so if she did something else, she was on warning. The question is, is this that something else that would justify the termination, or was this really — could a reasonable jury looking at these facts, construing all the facts in the plaintiff's favor, view this as discrimination on the basis of religious views? Your Honor, yes. I mean, the statement, which we — I think we're working with the understanding that this isn't just a question. This is her making a statement with a question mark rhetorically, is meant to agitate the situation and — But we are at the summary judgment stage, and we have to construe facts most favorable to the non-moving party, the flight attendants. And this whole statement, as a company, do you think it's possible to regulate morality? It can be viewed in different ways. And there's one way, which Alaska took as an offensive statement, but there could be just — the other view is Alaska asked its employees, what are your views on this act? And she expressed her views. So why isn't this for a jury to determine what this statement meant, and was Alaska justified in firing them? I appreciate that, Judge Lee. The — Alaska didn't ask, what are your views on the morality of the LGBTQ community, which is what she's commenting on. Alaska posted the Equality Act, which was about providing rights to the LGBTQ community, which she could have commented on, whether she was in support or not in support of that act. That's not what she did. She then used that opportunity to broadcast to 26,000 people that she thinks that that lifestyle is immoral. She never used those words. Again, you're kind of imputing this. It says, do you think it's possible to regulate, i.e. legislate, morality? And again, if — I mean, in part, this was Alaska's problem. They picked a law that was probably controversial. People were — people had differing views, and then asked them to — for their opinions. And you're going to get opinions pro and con. And it looks like she expressed an opinion that's con, but it's not — you know, if she used a slur or certain things, I think we can all agree, you know, Alaska would be justified in firing. But this is a pretty vague statement that's susceptible to multiple meanings. Your Honor, respectfully, I don't think it's a vague statement. And I think the context matters, especially with this particular — Can I ask you to stop there, though? I appreciate that you're basically answering Judge Lee's question by saying you think it can't be — cannot be interpreted two different ways. I get that. But what do we do about the fact — I think we're skipping over a step here. Alaska got a response from her. She's got a question mark at the end of that statement. Alaska — there's some indication that Alaska interpreted it initially as a philosophical question. There's an internal dialogue where they say, this isn't a philosophical question. How should we respond? And they responded. They didn't immediately take it down or discipline her. Okay? I'm really interested in the legal ramifications of that being management's initial response to her. And then Alaska — or management, I'll just say Alaska's management — recognizing that their employees were not taking it that way. They were offended. So, hence, this overlap with the hostile work environment. How do we analyze that? I'm looking now at the — I've given you the fact pattern as I understand it, and I'm trying to figure out, as a matter of law, does that change the permissibility of Alaska taking the steps that it took against a person who was on probation? I think it's important to just kind of fill out that record a little bit on what happened. Sure. So, when she posted this statement, and then they respond, and they put in their — the response you just said, as well as, you know, we have policies against discrimination. The record is that that was not limiting — that that wasn't the only response. It was something that they needed to immediately put up. They needed to respond. I think this was — my memory, I'm sorry, Your Honor, I don't remember this exactly, but I think this was happening towards the end of a week. And so they felt like they needed to respond immediately. That doesn't mean that they weren't going to discipline her. That doesn't mean that they weren't going to investigate it, but they needed to do something to respond. But was that response one that went out to the whole group?  Not just to her? Yes. Okay. Yes. And then they — and then I'm — thank you for that clarification. And then I'm interested in the — so the legal consequences of Alaska recognizing, if I can say that, if I interpret the record to be that Alaska realizes over the course of a few days, this is not landing well in the workplace, and people are offended and concerned, again, and going to their duty vis-a-vis the hostile work environment. So how does that change the legal analysis? Well, Your Honor, one, it wasn't over a few days. This is happening kind of pretty quickly within a day. And why I think it matters from a legal perspective is that once Alaska is aware that its employees are — employees meaning folks in that protected community — are interpreting these statements as harassment. We are now asking Alaska to be on the razor's edge of liability and think about whether they protect the people in the LGBT community from their concerns or somebody who, at that point, wouldn't even know that she's religious. Is this a situation the company created by having — by posting, you know, support for a political initiative and then inviting people to comment on it? I mean, it seems a very different case if a flight attendant is just saying something to a coworker or to passengers or — but here it's an open forum. Respectfully, Your Honor, kind of two points on that. One, they're posting their support of an act that was to provide rights to — the same rights to the LGBTQ community. They're not posting an article asking for people to comment on morality or transgender rights or any — But so what if she posted saying, I don't think people — I don't think LGBTQ people should have the same rights? Is that harassment? Yes. Okay. So the position of the company is essentially once it posts these things and invites comments, it's not okay to have a negative comment? No. The position of the company is that you can share your — and actually, looking at even the commenting rules, if you have a position that is going to violate Title VII, it's going to be harassment — or violate their policy, rather, it's going to be harassment. They would tell you not to do that with 26,000 people, not to broadcast that view. The commenting rule, the amended rule, tells you that there are certain topics that shouldn't be debated here. They were not asking — as relates to Smith, which is who we're talking about — there's nothing about that article that would have invited her to comment on the morality. And I guess I would — I'm not sure why not. It seems to me that you're right between these two hypotheticals that my colleagues have asked you to entertain. One is a flight attendant who just sort of sua sponte makes this announcement on a flight. And I think you've said, not okay. Or maybe that was opposing counsel. Forgive me. Yeah, that was opposing counsel. But I agree. But Judge Bress has asked you a different question. Given that Alaska has this forum, right, and they're posting their position on something — and it is a forum that's not just an announcement, because they could certainly email their employees and just say, hey, we support this Black Lives Matter or we support this Equality Act. It is in a forum that invites response, isn't it? It is. And there's a pop-up that says, beyond best behavior, we have a zero-tolerance policy, of course, I'm summarizing. So how does that change the analysis? The pop-up? No, the fact that Alaska is making this announcement, it wants to be able to show its support for the Equality Act. I appreciate that. But it could have done that in a way that didn't ask for employees to jump into the conversation. But they did — that's Judge Bress's point, right? They posted it in a place where employees were, I think, invited to respond.  So it's kind of dangerous waters, but that's what they did. How does that change our analysis? So they were invited to respond. And the question in my mind, and I would ask the Court to think about, is what were they invited to respond with, right? Not with harassing statements. And we have evidence in the record of other people who had — not on the intranet, but who had responses to Alaska's support of the Equality Act. We have Joe Sprague, who was the president of Horizon Air. He made a number of religious-based comments in response to Alaska's support for the Equality Act. No disciplinary action taken against him. And he was talking with other executives. So this is the highest level of Alaska. They're talking about people not agreeing with Alaska's position. There's evidence in the record of a pilot — I think we call him Pilot G — who also has concerns with Alaska's position on the Equality Act. And the CEO, Brad Tilden, engages with him and talks to him about that. And we can see an email thread on the inside of how they're receiving the pilot's comments. And there are no negative responses. So it's not that Alaska is taking issue with the fact that people are not in support of the Equality Act. They are taking issue with the fact that Smith and Brown, who we haven't talked much about, but both of those individuals made statements that went beyond the bounds of just religious expression. They violated Title VII. So long as we have religions that are not perfectly aligned with Title VII, we will have restrictions on religious expression in the workplace. There are things that we say in our scriptural studies or in our small groups that just have no place at work. I might say, for example, I'm called to love my neighbor as myself. That's OK for me to say that. That doesn't violate Title VII. But what we don't want is somebody who, let's say, has a religious belief against the military, for example, because their religion has religious tenets not to promote violence, and now they're going into the workplace and making harassing statements towards the military and our veterans. There have to be boundaries to what can be said. If here, Alaska had decided in its notice of discharge, the reason we're firing you is because of the nature of the religious beliefs expressed in your posts, I take it, we all agree, they can't do that. Even if Alaska might have also regarded the statements as harassing. No, if they were firing them because of their beliefs and not their conduct, their harassing conduct, I would agree. They can't fire them for their beliefs. They can fire them for engaging in conduct, even if inspired by religion, if it violates Title VII or their policies, which is what they did. Right. But I mean, the question I guess I keep coming back to is who should decide this? Should this be decided by a court or should this be decided by jurors who would listen to these arguments and hear the witnesses and hear the testimony of the people who are involved in this and hear people explain some of these text messages, particularly the one about unifying faith with inclusivity, which I think is a tough piece of evidence for your side and make the judgment as to whether the reason this was the firing happened was because of harassment or maybe because of religion. Well, Your Honor, as to the evidence and the evidence specifically against Alaska, there isn't well, first, we'll look at the comparator evidence, lots of comparator evidence in here, no record of people's religious background. So it's like a race discrimination case where we don't know anybody's race but the plaintiff. They have to be outside the protected category to be a comparator. I thought the idea was there was some other kinds of comments that were also harassing or could be perceived to be harassing and didn't result in termination. Right. And for us, some of them did result in termination. Some of them I think had a last chance agreement and we can go through each one if we need to. We're not going to do that because you're wildly over time, so.  Thank you. Thank you, Your Honor. No, no, no. You can finish. Please finish answering. I think you can address this question. Thank you. So as to the comparator evidence, for the reasons articulated in our brief, there's lots of reasons why those are different. And yes, there are some who have engaged in harassing behavior and had different treatment. But it still matters were they religious or non-religious. And there's good case law that talks about if we don't know that they're outside of the protected category, it's a not relevant comparator. Were they in the same working group? Was it the same conduct? Which matters? And I know that was a question, you know, if it's 26,000 or one, does that matter? Also the other evidence as against Alaska, progressive discipline policy, the commenting rules, these things. There was no evidence tying that to the decision maker and to prove discriminatory animus, which we have case law. I think it's the PepsiCo case that says you need to have that nexus. Thank you, Your Honor. Thank you for your argument. Counsel? Good morning, Your Honor. Good morning. May it please the court, Ben Berger on behalf of Association of Flight Attendants. And first off, I want to apologize for my non-appearance this morning because of some late-breaking health reasons. But with that said, I would like to use my time this morning to address three points. First, AFA explained its legitimate non-discriminatory reason for not advancing plaintiff's grievances to arbitration. Very simply, that was because it did not believe it could persuade a neutral arbitrator to overturn those discharge decisions. In the same way that you heard Counsel for Alaska talk about courts do not sit as a form of super-management, they also don't sit as a form of super-grievance panel to second guess a union's decision when it's evaluating grievances. Let's assume you're right on that. Does that resolve the case, though, as to the union? It does, Your Honor, because here, even if we accept that plaintiffs have offered circumstantial evidence of discrimination, which we dispute, then under the burden-shifting framework, we then examine whether the union has offered its illegitimate non-discriminatory reason. Nothing in plaintiff's briefing has ever disputed that that reason, that the union didn't think these cases were winnable, would not be winnable. The arbitration, I think you have a fair point at that stage in the process. The question I would have is, what about earlier when union leaders are essentially referring the plaintiffs to Alaska for discipline? Well, on that point, I really do want to correct the record, because it is not the case that the union reported either of the plaintiffs for discipline. In Ms. Smith's case, Alaska already had actual knowledge of her post, and when Mr. Peterson contacted Ms. Williams, he did not make any request for discipline to be imposed, similarly for Ms. Brown. But this part of the record is difficult for you, I think, because there's also testimony that he wasn't typically as involved as he was in this case. He seems to be, why couldn't a jury decide that he was going out of his way? Well, because we actually have the record evidence to see what his request was. And this, I think, is significant, what you heard for counsel, for plaintiffs this morning, say what his actual request was when he contacted Ms. Williams is, can we please have these comments shut down? And you heard counsel say, that would actually not be an adverse action. So we have to look at what was the actual request that Mr. Peterson said. But is there not a set of facts here under which a jury could conclude that Mr. Peterson and others were involved in bringing about the termination of these two plaintiffs? No, I don't think so, Your Honor, because you can take his individual comments for what they are, which I am happy to explain why we don't believe their amounts of circumstantial or direct evidence. But the problem that plaintiffs have is that those comments, the vast majority of them, preceded the union's decision to actually grieve the terminations. But what's interesting here is that many of the questions that Your Honor asked this morning about how to interpret the statement that Ms. Smith made, you can look at Alaska's notes from the grievance hearing where you will find Stephen Mahler, the union representative, making those very arguments. So the union thought, they filed these grievances because even though some union officers thought that the comments were ill-advised, were, you know, not what they were personally disagreed with their attitude towards transgender individuals, the union took the position quite immediately. We don't think that discharge is the punishment that's warranted here. And the union took many steps to advocate for plaintiffs in that respect. So it's our position that the actual institutional decision of the union to grieve these discharges is what's significant, not individual comments that may have preceded that decision. But these statements that we have on the record are really, really bad for you. I mean, things like, you mentioned, can we please get someone to shut down comments or put Marley and Lacey in a burlap bag and drop them in a well? She needs to go. The union president saying the post is reprehensible and there should be repercussions. I mean, the union president is supposed to defend union members. Sometimes they do bad things, inappropriate things, but unions defend their members, not say there should be repercussions. I mean, this is really, really bad stuff. Well, the union did defend its members because it filed grievances and represented them at the grievance hearing and even attempted to negotiate last chance agreements. But it's your honor that the quote that you reference about Mr. Peter saying these comments are reprehensible and there should be consequences in that very same statement, which was an internal union discussion. So no reason to think that the union would be, you know, making a show for some outside audience. This is Mr. Peterson saying to a union member who didn't want the union to make any advocacy on Miss Smith's behalf. He said, we have a duty of fair representation to these individuals. And if they are disciplined, we will subscribe to why couldn't a reasonable jury view that as insincere? Well, in the context of somebody who's who's said, yeah, this person is reprehensible. We want to put them in a burlap bag. And nonetheless, we will honorably defend them. It's it's difficult to, I think, make that inference when he's talking internally to union audiences. This is not him talking to the grievance themselves. It's not him talking to Alaska. This is what he's explaining internally. So I think we really have the problem. It's the internal comments that are that are so concerning. He's talking to Alaska. But what else? The text, though, I wish fewer people would struggle so much with unifying their faith with inclusivity that that was not purely internal, was it? That's that's true. But I think here we we find comments very similar to this in recent cases that this court has decided. So I'm thinking in particular of the Hiddle case where and Damiano, too, frankly, another case that you heard counsel for plaintiffs mentioned where the court found statements that particularly they yes, they reference the plaintiff's religion. But the context is important. It was not that Mr. Peterson said, I find objectionable plaintiffs religiously inspired view that there are two unfixed sexes. He said, I wish that plaintiffs could articulate their views in a way that also was consistent with the requirement of being honoring inclusivity in the workplace. And I think a jury could decide that. They could they could decide that. But would they have to? I would say because Hiddle and Damiano were decided on summary judgment that this the posture here is the same, it's there's only one reasonable inference. But even if the court were inclined to view it that way, then we still have to complete the rest of the burden shifting framework, which applies whether we're using the McDonnell-Douglas framework or the alternative, more holistic framework. The union then still gets to put forward its legitimate, non-discriminatory reason for taking the action that it did. And it is plaintiffs obligation to point to one of two things, either new evidence that shows that it was more likely than not that the underlying reason was discriminatory, which plaintiffs have not done. They've not said we have additional evidence or they can point to evidence from their prima facie case. But that specifically undermines the reason that the union offered. And in fact, in the Damiano case, the court reiterated language from an earlier case, Chong, that made this point explicit that it is OK for a plaintiff to rely on its prima facie case, but it has to specifically undermine the decision that the union made and its reasoning. We don't find evidence of that because the union did follow its written procedures and there is testimonial and documentary evidence of what the union, when it was deciding whether or not to take the two cases to arbitration, what the merits of that would be. And can you address, I know your time is running short, but since you represent the union, the preemption issue only affects the union. Can you address that? Yes. And your honor is correct that the issue is essentially moot. And I don't think you found any argument in the briefing from counsel that the damages would be different under state law. But even if it wasn't, the law of this circuit is governed by Adkins. And what Adkins reflects is it refutes the conflation that plaintiffs are trying to make between two kinds of RLA preemption. One form of preemption stems from the creation of system boards which channel disputes over contractual issues to arbitration. That's the one that plaintiffs rely on. But that's not what at issue here. Is that issue here? What's at issue here is the form of preemption that flows from the union status as exclusive representative and then the consequent doctrine of duty of fair representation. It is that. If that is the right interpretation of Adkins, does that put us on does that mean we're splitting with the second and eighth circuits on this? I do think that, yes, there is language from those cases that suggests that they interpret it differently. But I would submit that the Ninth Circuit has understood this language correctly because we have to go back to the statute itself. There are different provisions of the RLA that correspond to each of these preemption doctrines. We have the provision that establishes system boards and the minor dispute concept, the major minor distinction. That is one statute. And then there is a separate provision in section one of the RLA, which deals with the workers' rights to have union representatives and then the doctrine of duty of fair representation and preemption that flows from that. So we want to be focused on what is this not like a separate or independent duty in the meaning of Adkins, that that that it's not in the in the that if you're discriminating against somebody based on their race or their religion, that that's kind of outside the collective bargaining process itself. And there can be a separate claim. Well, sir, yes, that is what Adkins says is that there could be a state based claim if there were as union actions that were distinct from the union's role as collective bargaining representative. But I don't think there's any dispute that all of the complaints that plaintiffs have about the union union's conduct deal with its squarely with what how it was acting as a representative. Thank you, counsel. You're considerably over time. So we're going to stop you there. Thank you. Would you give me one minute, please? OK, thank you, your honors, the union just said that they that Peterson was not reporting the plaintiffs for discipline, the union or the record shows that this is not true. He wrote, Management needs to send her bigoted A.S.S. packing. That's at five E.R. one one five zero. He wrote, Management appears to be taking this seriously behind the scenes, or at least the initial signs are encouraging. And of course, you didn't hear that from me. That is that six E.R. one two nine six. And there are over 20 statements showing their hostility or the union's intent to get them fired or disciplined. Those are all compiled in a chart that is on six E.R. one two nine five through one three zero one. And this all gave the airline the impression that the union agreed with the terminations or at quote, off the record. That's at five E.R. nine eight two. So this is clearly not a situation where they were abiding by their standard practice. This the airline or the union argued that they were just concerned with the manner that they were expressing their views, not with the views themselves. But the record again shows that this is not true. Adams wrote that she's not friends with Brown because, quote, her friends are all good women with good values who believe in equality and she's too old to deal with crazy people and their S.H.I.T. That's at six E.R. one three five two. Taylor and Peterson called them the post reprehensible. When Brown was explaining her religious beliefs to the company, Taylor texted Adams that she may hurl and they joked about Taylor not being able to keep poker face when representing her. This is four E.R. eight four nine to 50. And the union, even the union, even their decision to take the case arbitration was infected with anti-religious bias. You look at the union screening notes when they're discussing whether to take the case arbitration. The union rights. So, again, call Smith a bigot and says you can be a bigot at home, but not at work. And putting on the pride hat, I was very offended by the question. So the union chose not to take the cases of Brown and Smith's arbitration, but they took the case of C.C. and R.N. R.N. was accused of inappropriately touching or groping three women. The union argues that R.N. deserves another chance. So this a reasonable jury viewing all the evidence could certainly find that this was religious discrimination. The union was deeply offended by their religious beliefs and the expression of those beliefs and did not represent them well or that infected their representation. In Woods versus Graphic Communications, this court stated that overt acts of discrimination by union officials are violations of type seven. And that is clearly what's going on here. In Goodman versus Luke and Steele, the Supreme Court interpreted the otherwise discriminate against language to say the plain language of the statute includes discrimination in the way that union officials represented workers. So this is clearly clearly discrimination. And as to the as to the company, the airline argued that plaintiffs were not fired for their religious beliefs, but a reasonable jury could find otherwise. At 5 ER 1055, the decision maker here wrote that she 100 percent agreed that employees are not entitled to their own beliefs on these issues, calling the beliefs themselves discriminatory. The decision maker also called opposite Brown using the phrase opposite sex discriminatory because it implied that there were only two sexes. That's at 4 ER 780 through 81. Plaintiff supervisors, I think the case against Smith is really different. Can you can you focus the point of your argument now on the comment related to Smith? Yes. Smith's supervisor testified that there was no way for Smith to have expressed her moral beliefs about LGBTQ issues to other employees without violating company policy. So it was about the airline defining her beliefs as inherently discriminatory, which is discriminatory on the basis of of religion. So Smith's that was at 3 ER 599 through 601. And Brown's supervisor also said something similar that she could not have expressed her beliefs in any way that was consistent with company policy. That is 4 ER 720. So Title 7. Title 7 protects employees, all sorts of employees, employee employers have obligations to all of their employees, and it's it's very these are very important civil rights protections. Employees should not be afraid of losing their jobs just because they're employers don't like their religious beliefs. We're asking for this court to reverse the opinion below. Thank you. We appreciate your argument and advocacy very much. We'll take that case under advisement and get to an opinion just as soon as we can. We'll stand in recess for today.
judges: CHRISTEN, LEE, BRESS